The United States v. Coney is our next case. Mr. Greenberg. May it please the Court, Jonathan Greenberg on behalf of Mr. Coney. The District Court put it best, there's no way we're going to send reams of Facebook communications and reams of text messages back to the jury. Mid-trial, the Court understood that if the jury saw everything in Coney's Facebook account and everything on his phone, there was no way he could receive a fair trial. But after the government handed all of that stuff to the jury, and after that tainted jury reached a verdict, the Court pivoted. Now, in its words, the nuclear option of a mistrial meant that all the effort put into trial would have been a waste. Mr. Greenberg. Go ahead. I don't think anybody would quarrel with the fact that things went wrong. I mean, the District Court said plenty of blame to go around. He should have supervised more. Lead prosecutor should have done more. Defense counsel could have looked at the thumb drive that was sent back. But there he was, you know, faced with a problem. And one of the things that I think is interesting is how long the jury had all this information. It was only a few hours, as I recall. I can't believe the jury sat there and read through 7,000 pages of computer and text records in just a few hours, unless they're much better readers than I am. So there's that factor. And the judge, evaluating the kinds of evidence that was there, in light of the background evidence in the case, particularly, he says he's very influenced by the fact that these minor victims all testified. And he makes the judgment that these curative measures will work. We have to find that's an abuse of discretion. And I'm not sure that it is. You're saying that this is irreparable, but I don't think this is a REMER situation. I think it's different. So I'll address all three of those questions and points. First, we don't know what the jury exactly saw. There were 7,000 pages or more. And of course, there's no way they looked at everything. But the government has the burden of proving no reasonable possibility of prejudice. So our ignorance of what the jury saw, that cuts against them, not Mr. Coney. That's what you say, but what establishes that? You're relying on REMER again, I think. But if Judge Wood thinks, and I'm inclined to think, this is not a REMER situation, you can't just say, well, they got the burden, so it's all irrelevant. It's not nearly that simple. Here's why this is a REMER situation. It's true that not all extra record contacts are presented with prejudice. This is not extra record material. All this material is in the record. Everybody agrees on that. The judge concluded that some things in the record would not be sent to the jury. That's not a REMER problem at all. We ordinarily say that judges have substantial discretion to determine which evidence in the record goes to the jury and which doesn't. What we have here is a situation in which the judge decided X would go to the jury, but X plus Y went to the jury. Very hard for me, at least, to see that as within the scope of REMER. So I don't think you can just bail out and say we have no burden at all. Just assume the worst. We're not in that world, counsel. And here's why this is a REMER case, Your Honor. The court made clear in REMER it went all the way back to a check. I don't think you are applying your time wisely by harping on REMER. You need to make a functional argument for the position you're taking. Your Honor, I respect that, and I understand. The court has our arguments about REMER in the brief, so I'll jump straight to the question of prejudice. This court, in cases like Sanders and Sababu, has made the inquiry clear. Can the government prove no reasonable possibility of prejudice based on the nature and extent of the evidence or the degree and pervasiveness? Let's just take prejudice sort of from a more neutral standpoint. I understood your argument to be that a jury that's bombarded with hundreds, let's say in the time they had hundreds or maybe thousands, of highly prejudicial photographs and materials, that it's just not going to approach the case based on just the evidence that the judge wants the jury to look at. Yes, Your Honor. There was no way a jury could dispassionately resolve this case once they were hit with that. And to go back to your original question, we don't know what they saw, but this was all triggered. Why not? This was all triggered. Why not? I apologize, Your Honor. Let me be very specific, as specific as I can, and that is what do we know about what happened physically and electronically here? As I understand it, we have a thumb drive and a disconnected laptop that were provided to the jury. Do we know anything about the file structures or the way materials on the thumb drive were indexed? It was all of the exhibits organized numerically. So they had everything that the government put into evidence. And to answer Judge Easterbrook's question, as to the why not, the court didn't individually voir dire the jurors and ask, hey, what did you actually look at? Why not? Because under this Court's precedent, for 60B reasons, that's not a good idea. 606 assuming that you have no burden of any kind, even to ask. But if you don't carry the day on that, the question why not, is very important. But even if we're not in Remmerland, and we contend that we are, this Court's precedent in Bruscino and Zababu makes clear it's still the government's burden. They have a burden to prove no reasonable probability of prejudice. The burden lies with them because it's constitutional error. This isn't just a run-of-the-mill evidentiary error. There is no constitutional error. All the evidence was in the record. There is a disjunction between what's on the USB stick and what the district judge wanted to send to the jury. That's not a constitutional error. You're making your problem go away by assumption. That's why I say you need to argue functionally. And my counterpoint, Your Honor, would be this isn't like Best. In Best, unquestionably, everything was properly before the jury. But here the Court said— Well, look, can I come at this in a somewhat different way? The judge admits as exhibits all these Facebook posts and the content, you know, the sweeps of the phones and all of that. Arguably, he admits it for a limited purpose, perhaps to form a foundation for what later gets actually used in the trial. And he wants only the latter to go back to the jury. But, in fact, through this series of errors, the whole thing goes back. So, yes, the evidence is in the record. It's not in the record for 100% purposes, and so that's why the judge didn't want it to go back. But it's still not the same as somebody trying to bribe a juror or somebody trying to bring outside information in. So what the judge does is he takes a look at what's on— what this impermissible evidence or the evidence that he didn't want to go back was, but he finds some of it to be cumulative and he finds some of it to be, you know, just sufficiently beside the point that he doesn't think the jury is going to pay much attention to it. Maybe in a 403B, yes, it's marginally relevant, but it's really not going to carry the day. And he's comparing it to the rest of the evidence. It is properly in the record. So unless there's a problem with that method of proceeding, then don't we just have to hold our nose and take the result of this trial? That would be the case if the court applied the correct law. I would concede that, because ordinarily trial courts get tremendous discretion when it's all of these questions, and this court has to be strongly convinced. But here, again, the court did apply the wrong law by not presuming prejudice. Remmer does apply to extra-record documents, and the key thing is authorization. It's not extra-record documents. I don't know how often you're going to say that, but none of these documents is extra-record. But they weren't authorized. We all agree on that. They weren't authorized by the court to go back. That's a totally different question. I disagree, Your Honor. And if you deny that it's a different question, I don't see how you can make an effective appellate argument. In Sanders, for example, this court held, as to an FBI contact with the juror, the key question that determined whether or not Remmer applied was, was the contact authorized by the court or not? The question is authorization. And here the court made clear, I did not want the jury to see any of this material. It says in its curative that you saw things that… Mr. Greenberg, let me ask you a less modern example. Yes, Your Honor. Let's suppose there's a dictionary in the jury room. Two scenarios after deliberations. One, the bailiff walks in, finds the dictionary on the table, and it's open to a key term in the jury instructions, and it's highlighted. Second alternative is the bailiff finds a dictionary that was left behind in a closed drawer in a cabinet. Are those comparable? Those are not the same scenario. And obviously where the key term has been looked at by the jury, we have independent evidence that they did look at it. That would, of course, be prejudicial. Whereas if there's no indication the jury even looked at the dictionary, that would probably be innocuous. But here, critically, this whole issue arose because the jury asked about one of the Facebook chats. So we know they were looking at these communications. We do have some evidence that they were. We know they were looking at the laptop and at the thumb drive, but we don't know what… Is there a reason? Was it not possible to trace, to track keystrokes or the history? That's a technological question beyond the scope of the record. Well, the question is why it's beyond the scope of the record, because I would have thought, this goes back to Judge Wood's original question, in essence, I would think somebody would need to show more about what the jury did and did not look at. And it would be foolish to presume they looked at everything that was on the thumb drive. But there was an evidentiary hearing about how this happened and what happened. And at that hearing, the government could do precisely that, and they didn't do that. And you all didn't ask that question either, I take it? The defense did not ask that question. But, again, the burden lied with the government. I see my time's expired. I understand that's your point. Okay. I respectfully ask this court to reverse. Thank you. Thank you, counsel. Mr. Crane. Good morning, Your Honors. May it please the court, Paul Crane on behalf of the United States. As has been recognized but worth saying again, even though there is blame to go around, the government does take primary responsibility for the error that happened. At the same time, we think the district court asked the correct question, which is, was there any reasonable possibility that the unpublished but correctly sent back to the jury affected its verdict? And we think the district court reached the correct answer for the reasons in its thorough opinion and our brief, that there was no reasonable possibility of prejudice here. There were some questions about sort of how did this happen, what was on the thumb drive. There's nothing in the record that clearly states how the thumb drive was organized. My understanding is similar to my friend on the other side. Well, I have Judge Hamilton's question again. Why? Why did neither side ask the judge to either put that evidence in the record about how easy it would be to find something on the thumb drive, or to ask any juror what happened? My best understanding in answering that question, Your Honor, is because while the parties and the district judge were trying to figure out, in fact, what materials were on the thumb drive, that the jury returned its initial verdict. And then at that point… Fine, but why? Right? The jurors are around. They haven't been sent to Australia. It's fairly easy to ask, and it's very easy to find out how the thumb drive is organized. It looks to me like this is a case where both sides said, well, the other side had the burden. And then the case gets to the Court of Appeals and we're going, how do we know what happened? I actually don't think the government is trying to shirk that it had a burden or the burden to demonstrate there is no reasonable possibility of prejudice. So you're willing to proceed, am I hearing you right, on the assumption, counterfactual though it may be, that the jury looked at every last one of these 7,000 and some documents? I don't think it's likely that's what happened. No, I don't think it's likely it's happened either, but you haven't given us an argument for a smaller set. I think that's, to be frank, Your Honor, I think that's how the parties and, as best I read the proceedings below, how everyone proceeded. They spent the weekend trying to identify what were the materials that might have been unpublished but nonetheless provided, and then they spent all of that Monday morning going through which materials would go back. So does the record show, for example, if somebody was sitting there pouring through 7,000 documents over that Saturday and Sunday, first of all, I'm sorry for them, they had a bad weekend. But secondly, they must have made some record of it, that of the 7,000, people put a lot of garbage on Facebook and other things. So of the 7,000, actually only 1,500 were problematic or something. Only 5,000 were problematic. Is there a record? As I understand the question, Your Honor, so just to be clear on the materials that went back to the jury but should not have. There's the two cell phone dumps, which are Exhibits 504 and 506. That's like another 3,000. Those are in total, correct, if you take them together, over 5,000. With respect to the Facebook records, it was not all of the Facebook records went back, just some additional portions. And that is what the parties identified in Documents 185 and 187. The government attached an exhibit in its weekend filing, identifying about 61 pages that it thought are improperly sent back. And then the defense identified a little over 100 pages, and that Monday morning the parties and the district judge went through the defense's suggestion of here's the Facebook records that should not have gone back. And actually, if you look at that transcript, a lot of them were left in. The cell phone dumps were the easiest to just remove those two exhibits. And then the jury was instructed on Monday afternoon, please go back, look, and if there's anything in there that might have affected your verdict. And they spent an hour doing that and came back with their second verdict, the verdict that we know. So do you happen to know if the things that properly went to the jury on Monday included material about the question that the jurors had asked on Friday while they were, you know, the thing that tipped everybody off the question? The thing that tipped everybody off was in reference to a conversation that was already had been published and was properly admitted. So they just had difficulty, as I read the question, finding it on the thumb drive. So how did that tip everybody off then? Because the jury was asking for a Facebook conversation that had been discussed during the trial. Then when the parties went to go find basically how to describe to the jury how to find it, at that point they discovered that there was lengthier excerpts than anyone intended. So the jury was asking for something that was properly published, but that then led to the parties and the district court realizing, oh, there was also these additional Facebook messages, which again wasn't. . . Did the court retain? I mean, surely there wasn't just one thumb drive. There must have been a copy of it. I assume that's correct, Your Honor, because there was a thumb drive provided to the jury and then the government had a copy, and I believe defense did as well, but that part's less clear in the transcript of the record. Do we have full access to that thumb drive? The original thumb drive or the second thumb drive? Anything. I don't know about the actual physical thumb drive. My assumption, though I have not confirmed this, so I apologize if it's mistaken, is that the second thumb drive is in the district court's keeping of other sorts of evidence. All of the evidence here was done electronically. This was sort of in the early trials getting back up and running. As for the original thumb drive, I do not know, Your Honor. I have not been able to access it myself. You have not? The original thumb drive. The one that was given to the jury. That's correct. Again, as I understand it, the materials that were improperly given to the jury, we actually have a pretty good idea of what those were, the two cell phones. But we don't physically have that thumb drive. I am not aware of where that is, yes, Your Honor. Yikes. Okay. Is there any way you have of looking into this, you know, with the district court's records or other sources? I am happy to further look. I have attempted to do that, Your Honor, and that has not proven successful, but I am happy to continue looking. We may be able to ask the district court clerk for some further searching. But I just have to express some considerable frustration that an awful lot that seems quite central to sorting out the consequences of this mistake just doesn't seem to be known. I don't disagree with that, Your Honor. And again, the government is certainly largely responsible for a lot of those types of mistakes. At the same time, I don't think we need to know those specific pieces of information because, as the district court sort of explained, none of those sort of additional materials there is any reasonable possibility to believe that in the context of this specific case and this specific trial to think that those materials affected the verdict. And that determination, as this court knows, is one that the panel typically gives a lot of deference to under the abuse of discretion standard and whether or not there was any sort of But in that instance, I worry, or at least I worried as I read through these materials, that Chief Judge Peterson was unduly horrified at the thought of a mistrial and going through all of this again. And nobody wants a mistrial, but they do happen occasionally. It doesn't seem like that's an evil to be avoided at all costs. I don't disagree with that statement, Your Honor. I understand Judge Peterson to, at first, wanting to let the process play out, provide the curative instruction that was given Monday, which we presume the jurors followed of, was there anything in there originally that's no longer there that might have affected your verdict? And then . . . That's quite a mental task, you know, to kind of delete from your brain the things that you had been looking at for the last few days and ask again. I guess respectfully, Your Honor, I think it's sort of not that far outside what we typically ask jurors to do. If there was something particularly prejudicial that a juror was relying on and they went and looked and saw that it was no longer there, I think that's sort of at least the possibility that the court had in mind. And although the defense moved for a mistrial, they were specifically asked if they have any issue with that curative instruction or that approach, and other than maintaining there should have been a mistrial, didn't disagree. They said, actually, I thought it was the best approach. Well, I think having been unsuccessful in the mistrial motion, I don't blame the defense counsel for failing to preserve this sort of thing. They tried for the mistrial, and there's some conversation about mistrial versus Rule 33, and they keep popping up and saying, you know, we really think that there needs to be a redo here. I see my time has expired. If there's no further questions, we ask the court to affirm. Thank you very much, counsel. Thank you. This is taken under advisement.